**ROCKWALL INDEPENDENT SCHOOL DISTRICT,**
. Plaintiff–Appellee,

v.

**M.C., as Next Friend for M.C., A Minor Child; A.C., as Next Friend for M.C., A Minor Child Defendants–Appellants.**

No. 14–10333.

United States Court of Appeals, Fifth Circuit.

March 10, 2016.

Charles J. Crawford, Brandy Nicole Davis (argued), Abernathy, Roeder, Boyd & Hullett, P.C., McKinney, TX, for Plaintiff–Appellee.

Myrna Bernice Silver, Esq. (argued), Law Offices of Myrna B. Silver, Dallas, TX, for Defendant–Appellant.

Before HIGGINBOTHAM, DENNIS, and HAYNES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

The parents of M.C., a minor child who qualifies for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, appeal the district court's judgment denying them reimbursement for the tuition cost of M.C.'s enrollment in a private school. Because the district court's findings and the underlying record support the conclusion that M.C.'s parents acted unreasonably in unilaterally terminating the process of developing M.C.'s Individualized Educational Plan ("IEP"), we affirm the district court's denial of reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that an award of private school tuition "may be reduced or denied ... upon a judicial finding of unreasonableness with respect to actions taken by the parents"); 34 C.F.R. § 300.148(d)(3) (same).

## I.

### A.

M.C. entered the eighth grade in the Rockwall Independent School District ("RISD") during the 2009–2010 school year. Before the beginning of the school year, M.C.'s parents had her evaluated by a psychologist and a psychiatrist who concluded that she suffered from depression and Attention Deficit Disorder ("ADD"). After being informed of these results, RISD performed a Full Individual Evaluation ("FIE") of M.C., which included a psychological evaluation by a Licensed Specialist in School Psychology. The FIE report concluded that M.C. was eligible for special education services as a student with an Emotional Disturbance but not as a student with Other Health Impairment such as ADD or Attention Deficit Hyperactive Disorder ("ADHD"). Thereafter, in February 2010, RISD held M.C.'s initial Admission, Review, and Dismissal Committee ("ARDC")[1] meeting during which an IEP was developed for her.

Thereafter, M.C.'s difficulties at school apparently worsened. Her grades declined. She was repeatedly truant. She was placed in detention and received both in- and out-of-school suspensions.

M.C. began her ninth grade year at Rockwall High School in the fall of 2010. However, on the night before the first day of school, M.C. left her home without permission, drove with a friend, and was in a car accident. As a result, M.C. received a 45–day suspension in RISD's disciplinary alternative education program. After completion of her suspension, M.C. suffered severe anxiety and refused to remain in school for the full day. Her psychiatrist recommended a residential placement.

In December 2010, a new ARDC meeting was convened, at which M.C.'s parents requested that RISD agree to place M.C. in a residential facility. RISD did not agree to this request but instead proposed

---

1. In Texas, the persons charged with preparing a disabled student's IEP are known collectively as an Admission, Review and Dismissal Committee. *See Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 247 (5th Cir.1997).

placing M.C. in RISD's "Transitions" classroom. The parents indicated they were willing to try this arrangement but also wanted to see progress such as M.C. achieving passing grades and not calling home. By this meeting, the ARDC had completed a counseling evaluation and, as a result, M.C.'s IEP was revised to include counseling for her for fifteen minutes every other week. In addition, at the meeting, the ARDC revised M.C.'s Independent Study Skills, Behavior, and Transition goals and objectives.

Before the December 2010 IEP could be put into effect, however, M.C.'s parents removed her from Rockwall High School and placed her in a residential treatment facility, the Meridell Achievement Center ("Meridell"), based on the advice of M.C.'s psychiatrist. This was done without the approval or involvement of RISD. M.C. attended Meridell from December 14, 2010 until February 15, 2011. While at Meridell, M.C. received instruction through the University of Texas–University Charter School—not by RISD. Records from an ARDC meeting convened by University Charter for M.C. (which did not involve RISD) reveal that M.C. participated in the general education curriculum with accommodations in an academic setting of between 8 and 12 students in a class, with faculty/staff available at all times, and escorts between classes.

Following M.C.'s discharge from Meridell in February 2011, her parents decided that she was not ready to return to RISD. Instead, they enrolled M.C. at the Dallas Learning Center ("DLC"), a non-accredited private school that uses simultaneous enrollment in the University of Nebraska's Independent Study High School, a fully accredited high school under the North Central Association. DLC's director testified that the school is a "very structured, tight environment, with constant supervi-sion." In addition, there is a "tutoring type of rapport" between students and teachers; there is a maximum of eight students to one teacher for each class; and DLC students have 15–minute breaks between each class period. M.C. continued her studies at the DLC for the remainder of the spring semester of the 2010–2011 school year.

In July 2011, M.C.'s parents filed a request for a due process hearing with the Texas Education Agency (TEA) seeking reimbursement for M.C.'s private school tuition of the 2010–2011 school year. Subsequently, the parents entered into a settlement agreement with RISD whereby RISD agreed, *inter alia,* to reimburse M.C.'s parents for M.C.'s private school tuition for the 2010–2011 school year as well as the fall semester of the 2011–2012 school year. Pursuant to the settlement agreement, M.C.'s parents agreed, *inter alia,* to provide RISD with no less than thirty days' notice of their intent to re-enroll M.C. in RISD if they decided to return during the 2011–2012 school year to enable RISD to schedule an ARDC meeting in order to devise an IEP for M.C.'s re-enrollment in the district.

**B.**

M.C. completed the fall semester of the 2011–2012 school year at the DLC. On November 11, 2011, M.C.'s parents notified RISD that they intended to re-enroll M.C. at Rockwall High School for the 2012 spring semester. Accordingly, an ARDC meeting was held on December 14, 2011.

A number of different parties attended the December 14, 2011, ARDC meeting. Representing RISD were: Dr. Mark LeMaster, the principal at Rockwall High School; Shadie Acosta, M.C.'s former algebra teacher; Rochelle Eddy, the special education counselor; Lea Garrett, the specialist in school psychology; Marian Hin-

ton, the chairwoman of the special education department; Sue Peterson, the diagnostician; Debi Buchanan, the special education director; Maurice Lane, the transition teacher; Cathy Honeycutt, the executive director for special programs; and Katie Duran, the counselor at Rockwall High School. On behalf of M.C. were: her parents and Mara LaViola, a special education advocate (the "Advocate").

Dr. LeMaster opened the meeting by explaining that "everybody is free to talk" and "[e]verybody gets to be heard." He also indicated that the purpose of the meeting was to "see how [the ARDC] could come to decisions ... about M.C. and what's in her best interest." Following introductions, the meeting then commenced with a cursory review of M.C.'s prior evaluations, all of which were considered "current."[2] Ms. Garrett explained that M.C. was eligible for special education services because she has an "emotional disturbance," meaning that "emotions and behaviors interfere with her learning and her educational progress." Ms. Garrett further noted that RISD had reviewed an outside psychological evaluation by Meridell conducted in 2010 as well as a counseling evaluation. Ms. Honeycutt then explained that the most recent evaluations had all been reviewed in previous ARDC meetings and opined that there was no need to re-review them "at this point." According to Ms. Honeycutt, everyone in attendance understood that the evaluations were current and "that [M.C.'s] disability is for special education and that she's going to get counseling as a related service."

The group proceeded to discuss M.C.'s TAKS[3] history, and Ms. Honeycutt noted that the group would discuss "[l]ater on ... TAKS testing that [M.C.] will take after we've ... talked about what her program looks like."

The ARDC then moved on to discuss transition services, which included postgraduate career goals as well as M.C.'s needs in her transition back to RISD. With respect to career goals, Ms. Peterson explained that the most current information RISD had for M.C. reflected that she was interested in pursuing cosmetology. In response, M.C.'s mother explained that M.C. has "had a complete turnaround" and now wanted to do "something more." Officials from RISD noted this change and explained that it was common for students to change their minds about career interests. The conversation then turned to transition goals, which "define interests and abilities related to potential career and job opportunities."

During this discussion, M.C.'s parents explained that they "thought we were going to look at what they were doing at DLC and try to duplicate some of the things they were doing there because [M.C. has] been so successful there." In response, Ms. Honeycutt explained that, at this point in the meeting, they were just discussing transition goals. RISD officials explained that there were a number of different "transition"-related subjects to consider for M.C.: (1) M.C.'s transition back to RISD from private school; (2) the specific Transitions classroom that is used to assist special education students at RISD; and (3) M.C.'s eventual transition

---

**2.** Under the IDEA, reevaluations shall occur at least once every three years, unless the parents and local educational agency agree that reevaluation is unnecessary. *See* 20 U.S.C. § 1414(a)(2)(B)(ii).

**3.** TAKS refers to the Texas Assessment of Knowledge and Skills Test that is required by the state and designed to measure the extent to which a student has learned and is able to apply the defined knowledge and skills at each tested grade level.

out of high school and into a career. Ms. Hinton explained to the parents that it was this latter transition—M.C.'s transition from high school into a career—that was the focus of the current conversation. The parents indicated that they wanted to listen to RISD's proposals. Dr. LeMaster told the parents to speak up if anything was unclear to them and assured them that the ARDC could "come back" to any topic "at any point in time."

The group next discussed M.C.'s "progress in gen ed." Ms. Duran, the counselor at Rockwall High School, reviewed M.C.'s grades from the DLC, which were all A's and B's. Based on these grades and her conversation with the DLC Director, Ms. Duran opined that M.C. was "doing very well." Ms. Duran noted that RISD had not received an official transcript from the University of Nebraska, the accredited school that handled the academic curriculum at the DLC. Ms. Duran explained that until RISD received an official transcript form the University of Nebraska, M.C. would still be considered a freshman. However, RISD officials stated that they wanted to give M.C. credit for these courses but that they required an official transcript from the University of Nebraska to do so. Ms. Duran explained that once RISD received an official transcript, then M.C. would be considered a sophomore.

The parties continued by discussing "behavior needs" and looking at "the behavior plan." Mr. Lane, the teacher in charge of the Transitions classroom, explained that RISD had methods of helping M.C. "master independent study and organizational skills needed for success in the mainstream." RISD stressed that it could be flexible and allow M.C. to transition into general education classes as she felt comfortable. However, RISD also emphasized that it encouraged its students to go into the mainstream as much as possible. Specific strategies and goals were then discussed. The parties discussed possible guidelines for both M.C. and her teachers in order for her to reach certain goals. During this portion of the meeting, M.C.'s parents and the Advocate discussed techniques that were being utilized at the DLC that were successful for M.C., including daily meetings with her teachers to help her prioritize her work and using a notebook to help organize assignments. RISD officials took note of these suggestions and agreed that they would incorporate them into M.C.'s IEP. RISD officials also noted that they previously had visited the DLC and observed some of these techniques.

The ARDC then discussed M.C.'s counseling goals and objectives. Ms. Eddy, the special education counselor, explained that the "annual goal" is for M.C. to "demonstrate improved coping skills in the school setting" by mastering various objectives. These objectives included, *inter alia*, identifying triggers for anxious feelings in the school setting and describing "positive aspects of self, especially in regards to overcoming obstacles." In addition, thirty minute biweekly counseling sessions with Ms. Eddy, the special education counselor, were added to the services M.C. would receive. Ms. Eddy noted these counseling sessions would involve "role playing" and giving M.C. "different scenarios."

The ARDC's discussion returned to behavioral issues, namely M.C.'s behavior in the classroom as well as some discussion of her performance in math. Ms. Acosta, M.C.'s former math teacher, noted that math was a difficult subject for M.C. but opined that this difficulty may have stemmed, in part, from attendance issues, explaining that "it was very difficult [for M.C.] because when you're not there daily, today's material depends on yesterday's material." Nevertheless, Ms. Acosta ex-

plained that despite the attendance issues, M.C. was usually well-behaved and an "active student" in class. M.C.'s parents explained that her attendance issues were tied to her experience being bullied at school. Her parents also explained that M.C. was fearful about returning to RISD based upon her prior experiences there. Different ways of helping M.C. feel safe at RISD were discussed, including using covert monitors in the hallways. The parents noted that M.C. felt "comfortable" at the DLC but not at RISD. Ms. Garrett explained that RISD "want[ed] to provide her a flexible level of support to make her comfortable." M.C.'s parents also articulated their concerns about M.C. feeling different from other students at Rockwall High School as a result of the services she would be provided, whereas at the DLC "everybody is treated the same way." In response, RISD officials explained that it would incorporate ways for M.C. to access services without being "singled out." The parties then began a lengthy discussion about different ways to emulate the techniques and methods utilized at DLC and what accommodations would make M.C. feel more comfortable in RISD, such as offering extended time for completing tests, building in breaks between classes, and matching M.C. with a peer buddy. Ms. Buchanan explained that there is "a continuum of opportunities for [M.C.] to be in a much smaller environment all the way to the full gen ed environment depending on her comfort level, depending on how things are going for her, depending on the day."

At one point during the meeting, the Advocate requested that a Functional Behavior Assessment ("FBA") be conducted for M.C. Ms. Garrett explained that RISD had already conducted an FBA in connection with the 2010 ARDC, and that it would be difficult to do another at this point in time because M.C. had been out of RISD for so long. The Advocate responded that she understood this and agreed that the prior FBA could serve as an interim until M.C. returned to RISD and current data could be gathered about her progress. The Advocate explained that she wanted data on M.C.'s transition to evaluate, for example, how M.C. handled the new situation and whether she "come[s] up with her own strategies." The parents did not object to this arrangement. All the parties thus recognized that certain features of a final IEP would have to be refined once RISD could collect data *after* M.C. returned to RISD.

Throughout the meeting, not only did the parents and the Advocate frequently voice their questions and ideas about RISD's proposals, but RISD officials repeatedly revised the language of their proposal to incorporate the parties' suggestions.

Toward the end of the ARDC meeting, the parents presented their own alternative proposal for M.C. M.C.'s father explained that he believed it would be a "bad decision" for M.C. to return to RISD in the middle of the school year. Instead, he proposed that M.C. be allowed "to finish the school year at DLC where she's been very successful and at the same time, maybe look at some transitional things" that could be done "along the way." For example, M.C.'s father suggested that M.C. could "stop into" Rockwall High School on her way home from DLC and, perhaps, take a theater class in order to "ease her ... back into the school." He explained: "I would love for [M.C.] to be able to come back to school. I would love for her to learn how to cope and transition. I just don't think the timing is right at this point." M.C.'s father then shared a letter from the Director of the DLC, who opined that it was in M.C.'s best interest to remain at the DLC one more semester "so

she will be adequately prepared for the transition." M.C.'s father and the Advocate later stated that a slow transition, in which M.C. remained full-time at the DLC but took one or two classes at RISD in the spring, would be more appropriate. RISD took notes of the parents' proposal, and Ms. Buchanan confirmed that the meeting minutes captured the parents' proposal.

The meeting concluded on the same day without the parties being able to discuss all of the subjects relevant to the IEP and without an agreement on those proposals that were discussed, including the parents' proposal that M.C. remain at the DLC for the spring semester. It was therefore agreed that the ARDC would reconvene on December 20, 2011 to resume discussions for the development of an IEP for M.C.

On December 16, 2011, Ms. Honeycutt e-mailed the parents to explain that they would need to reschedule the ARDC based on the need to have RISD's legal counsel present at the meeting in light of the parents' "unique" proposal to place M.C. at the DLC for the spring semester. Ms. Honeycutt proposed rescheduling the meeting for after the holidays. The parents replied to this e-mail by expressing concern that rescheduling the meeting may keep M.C. "in limbo" since they wanted to "get M.C. back in to school after the holiday." Ms. Honeycutt responded that RISD would be willing to keep the original December 20, 2011, date if the parents would be willing to waive the five-day notice necessary for RISD's attorney to be present. M.C.'s parents responded by expressing their disappointment that RISD felt it necessary to involve its attorney in the ARDC process. Further, the parents explained that they had spoken with their attorney who told them that it was unnecessary for them to return to another ARDC meeting. In the parents' view, they did "not believe that an ARD is nec-essary at this time." According to the parents, "all that is left is for the District to let [them] know what their decisions is" regarding the parents' proposal to allow M.C. to remain at DLC for the spring semester.

On December 20, 2011, Ms. Honeycutt responded to the parents' request by signed letter. She explained that, "because the ARD committee was unable to finish the December 14th ARD meeting and [M.C.] has not been enrolled in [RISD] since fall of 2010, currently there is no IEP in place for [her] when school resumes in January." However, Ms. Honeycutt noted that the ARDC had successfully completed draft substantive goals and objectives and a schedule of services for M.C. (the "Interim Plan") that could "serve [M.C.] in the interim until the ARD committee reconvenes in early January." *Id.* These consisted of goals and objectives in the following content areas: "Transition"; "Behavior"; "Counseling"; and "Independent Study Skills." Absent from the Interim Plan was a finalized "Admission, Review, and Dismissal Individualized Education Program Report," which would have included all of the sections of a completed IEP. Those missing sections had been in the draft IEP documents RISD brought to the December 14, 2011, meeting but they had not been finalized at that meeting. Ms. Honeycutt's letter further explained:

> The ARD Committee listened to your concerns at that time, and the District has reviewed the information and documentation received from the Dallas Learning Center, including the letter from Ms. Herrin–Kinard, the Director. However, we have found no services or accommodations provided by the Dallas Learning Center that Rockwall ISD cannot provide to [M.C.] ... Because the District is ready, willing, and able to provide [M.C.] with a Free Appropriate

Public Education when school resumes after Winter Break, we do not feel that it is appropriate or necessary for [M.C.] to return to the Dallas Learning Center in January. If you have additional information to share with the ARD Committee regarding [M.C.'s] placement at the Dallas Learning Center, the Committee will certainly consider it at the January ARD meeting.

Ms. Honeycutt also proposed additional dates in January (the 5th, 6th, 11th, and 12th) for the ARDC to be re-convened in order to develop a finalized IEP for M.C.

M.C.'s parents responded via e-mail to Ms. Honeycutt's letter by explaining that they were "extremely disappointed" with RISD's position. The parents rejected RISD's suggestion to implement the Interim Plan until an IEP could be finalized for M.C. While acknowledging that the "goals, objectives, and schedule of services were still in a development phase and nowhere near completion" at the end of the December 2011 ARDC, the parents nevertheless explained that they did not "feel at this time the RISD can provide [M.C.] with a Free Appropriate Public Education." They further explained that RISD left them "no choice but to reenroll [M.C.] at Dallas Learning Center," and that they expected "full reimbursement from RISD for all fees and expenses" incurred during the spring 2012 semester there.

The parents and Ms. Honeycutt subsequently exchanged additional emails, in which Ms. Honeycutt re-emphasized RISD's readiness and ability to provide M.C. with a FAPE. Ms. Honeycutt also proposed holding an ARDC meeting on January 3, 2012, so that the ARDC could try to finalize an IEP for M.C. prior to the first day of school. In response, the parents stated that "RISD may be ready and

willing but I did not agree they are able" to provide M.C. with a FAPE. According to the parents, "[t]he right approach for [M.C.] is a slow transition back in to RISD. The professionals that currently work with [M.C.] all agree with that approach and are willing to provide statements if necessary." The parents stated that "there is no point" in having a follow-up ARDC meeting if RISD refused the parents' proposal to allow M.C. to remain at the DLC.

No subsequent ARDC meeting was held, and M.C. returned to the DLC for the spring 2012 semester.

### C.

In February 2012, M.C.'s parents filed a due process complaint with the TEA, requesting reimbursement for M.C.'s spring 2012 tuition at the DLC. A due process hearing was subsequently held before a special education hearing officer appointed by the TEA (the "Hearing Officer"). In August 2012, the Hearing Officer issued a decision, concluding, *inter alia*, that M.C. and the parents had met their burden under the IDEA to show RISD's proposed December 2011 program was not reasonably calculated to provide a FAPE to M.C. In addition, the Hearing Officer concluded that the parents had met their burden to show that they were entitled to reimbursement of their expenses for enrolling M.C. at the DLC in the spring 2012 semester of the 2011–2012 school year.

■ RISD appealed the Hearing Officer's ruling by filing a complaint with the district court. On February 17, 2014, after considering the parties' arguments, the district court reversed the Hearing Officer's decision and granted summary judgment in favor of RISD.[4] The district court

---

**4.** In an IDEA case, "[w]hen neither party has

requested that the district court hear addi-

determined that RISD had complied with both the procedural and substantive requirements of the IDEA and thus concluded that M.C.'s parents were not entitled to reimbursement for tuition or course fees for the spring 2012 tuition at the DLC. This appeal followed.

## II.

In a case arising under the IDEA, "[a]lthough the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir.1997). Thus, the district court's "review" of the hearing officer's decision is "virtually *de novo.*" *Id.*

"We then review the district court's decision *de novo*, as a mixed question of law and fact." *R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir.2012). However, we review the district court's findings of underlying facts for clear error. *Id.* "The clear error standard of review precludes reversal of a district court's findings unless the court is left with a definite and firm conviction that a mistake has been committed." *Houston Indep. Sch. Dis. v. V.P.*, 582 F.3d 576, 583 (5th Cir.2009) (citation and internal quotations marks omitted).

## III.

The IDEA requires states to provide disabled children with a "free appropriate public education," *i.e.*, a "FAPE," in order to receive federal funding. 20 U.S.C. § 1412(a)(1)(A); *Richardson Indep.*

*Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 (5th Cir.2009). "[T]he FAPE must be tailored to the child's particular needs by means of an individual education program ('IEP'), which is a written statement prepared at a meeting by a qualified representative of the school district, a teacher, the child's parents, and, when appropriate, the child himself." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003). As explained above, in Texas, the group of individuals responsible for meeting and developing a disabled child's IEP is known as an Admission, Review and Dismissal Committee, or ARDC. *Id.*

Nevertheless, the IDEA does not entitle a disabled child to an educational program that "maximizes" her potential. *Michael F.*, 118 F.3d at 247. "[R]ather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Id.* at 247–48. "Still, the educational benefit cannot be a mere modicum or *de minimus*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Michael Z*, 580 F.3d at 292 (internal quotation marks omitted). "In short, the educational benefit that an IEP is designed to achieve must be 'meaningful.'" *Michael F.*, 118 F.3d at 248.

When parents unilaterally remove their child from a public school, the IDEA permits hearing officers and courts to order the reimbursement for the expenses of private schooling in certain situations:

tional evidence ... there is nothing new presented only to the district court; thus, '[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administra-

tive record.'" *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997) (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)).

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii). To receive reimbursement, a disabled child's parents must prove both "that (1) an IEP calling for placement in a public school was inappropriate under IDEA, and (2) the private placement was proper under the Act." *Michael Z*, 580 F.3d at 293.[5] When parents challenge the "appropriateness" of an IEP, the district court's inquiry, and ours on appeal, is generally circumscribed by two questions. *Adam J.*, 328 F.3d at 809. First, we determine whether the school district complied with the procedures prescribed in the IDEA. *Id.* Second, we evaluate whether the school district complied with the substantive requirements of the IDEA by developing an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotations marks omitted). In the instant case, the district court answered both of these questions in the affirmative and thus concluded that RISD was not required to reimburse the cost incurred by M.C.'s parents for enrolling her at the DLC during the spring 2012 semester.

 On appeal, M.C.'s parents argue that the record does not support the dis-

trict court's ultimate conclusion that RISD complied with the procedural and substantive requirements of the IDEA, thereby inviting us to revisit the question whether RISD offered M.C. an educational program that was "appropriate" within the meaning of the IDEA. In response, RISD not only contends that the record supports the district court's holding that it offered M.C. a FAPE but also argues in the alternative that we may decline altogether the parents' invitation to review the appropriateness of M.C.'s IEP by taking a more direct path to affirmance. Specifically, RISD argues that the record here supports a finding that the parents acted "unreasonably" during the IEP-development process, thus barring them from recovering tuition expenses under the IDEA *regardless* of whether RISD offered M.C. a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148(d)(3). We agree.

 Although the IDEA "imposes extensive procedural requirements" designed to provide parents with an opportunity for meaningful input, *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 493 (5th Cir.1995), this "right to provide meaningful input is simply not the right to dictate an outcome," *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir.2003); *accord Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 995 (1st Cir.1990) ("The [IDEA] ought not to abet parties who block assembly of the required team and then, dissatisfied with the ensuing IEP, attempt to jettison it because of problems created by their own obstructionism."). Indeed, as other Circuits have explained, "[t]he IDEA was not intended to fund private school tuition for

---

**5.** However, if parents fail to satisfy their initial burden of showing that an IEP calling for placement in public school was "inappropriate" under the IDEA, "then there is no need

to inquire further as to the appropriateness of [the private school placement]." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 132 (5th Cir.1993).

the children of parents who have not first given the public school a good faith opportunity to meet its obligations." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir.2010) (citing *Roland M.*, 910 F.2d at 995). Commensurate with these principles, the IDEA and its implementing regulations specifically provide that an award of private school tuition "may be reduced or denied ... upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148(d)(3).

In the instant case, although the district court made no specific conclusions regarding these particular provisions of the IDEA, the district court's factual findings and the underlying record nevertheless support the conclusion that the actions of M.C.'s parents were "unreasonable" within the meaning of the IDEA, thus warranting a denial of tuition reimbursement. *See Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 193 (5th Cir.2013) ("[W]e may affirm a grant of summary judgment on any ground supported by the record, even if it is different from that relied upon by the district court."). Although "[t]he development of an IEP is meant to be a collaborative project," *see C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir.2008), the district court found that M.C.'s parents "limited their own participation [in the IEP-development process] by adopting an all-or-nothing position," *viz.*, that M.C. should be re-enrolled in the DLC or else. As explained below, the record amply supports this finding.

At the December 2011 ARDC meeting, RISD officials repeatedly solicited and incorporated the parents' suggestions for M.C.'s IEP, including their ideas about how to emulate some of the DLC's techniques that had proven effective for M.C.

For example, RISD agreed, *inter alia*, to incorporate into the IEP DLC's technique of providing M.C. with extended breaks between classes. Moreover, the record reveals that, when the ARDC meeting concluded without a final agreement on M.C.'s IEP, RISD remained open to discussing at a follow-up ARDC meeting the parents' "unique" request that M.C. remain at the DLC for the spring 2012 semester. In fact, Ms. Honeycutt's correspondence to the parents expressly encouraged them to send "additional information" regarding their proposal to let M.C. remain at the DLC so that the ARDC could "consider it at the January ARD meeting."

As the district court correctly observed, in sharp contrast to RISD's collaborative approach to the IEP process, "the record shows that the Parents had no intention of continuing with the ARDC unless RISD approved their proposal" to allow M.C. to remain at the DLC for the spring 2012 semester. For instance, when RISD sought to reschedule the follow-up ARDC, M.C.'s parents responded that "we do not believe that an ARD is necessary at this time" and explicitly refused to attend any subsequent meetings—despite the fact that all parties understood that no IEP had been finalized at the end of the December 2011 meeting and further discussions were necessary. According to M.C.'s parents, "all that is left is for the District to let us know what their decision is" regarding their proposal to allow M.C. to remain at the DLC. Subsequent correspondence from the parents further reflects their complete unwillingness to cooperate unless RISD agreed to their proposal in full. In an email to M.C.'s parents dated December 27, 2011, RISD again reiterated its view that it could provide M.C. with a FAPE and proposed rescheduling the ARDC for January 3, 2012, in order to finalize M.C.'s IEP before the start of the

spring semester. In response, the parents once again refused to continue discussions with RISD unless the district agreed in full to their proposal:

> If the ARD committee is willing to agree with our proposal of a transition period for [M.C.] in spring 2012 [illegible] we would be more than happy to meet in January and continue to work on her IEP/BIP. If [illegible] ARD committee refuses to change their stance then there is no point in having a meeting.

M.C.'s father's testimony at the due process hearing further highlights the parents' inflexible position during the IEP process: "I was more than interested in working with Rockwall School District on continuing to work with the IEP as long as [M.C.] was able to, you know, do the transition thing that we were talking about."

In sum, the record indisputably reveals that the parents adopted an "all-or-nothing" approach to the development of M.C.'s IEP and that they thereby adamantly refused to consider any of RISD's alternative proposals that did not involve M.C. remaining at the DLC for the spring 2012 semester. As the district court supportably found, the parents' actions "broke down" the IEP-development process, resulting in an incomplete IEP for M.C. for the spring 2012 semester. We conclude that the parents' actions, well-intentioned as they may have been, constituted an unreasonable approach to the IEP-development process, rather than the collaborative or interactive approach envisioned by the IDEA. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148(d)(3). We therefore conclude that the parents are not entitled to reimbursement of costs incurred by M.C.'s attendance at the DLC for the spring 2012 semester. *See Five Town Cmty. Sch. Dist.*, 513 F.3d at 285 (denying reimbursement under 20 U.S.C. § 1412(a)(10)(C)(iii)(III) where the "parents' single-minded refusal to consider any placement other than a residential one" was the reason that the IEP process was disrupted and that no final IEP was developed). Accordingly, the judgment of the district court is affirmed.

## IV.

For these reasons, we AFFIRM the judgment of the district court denying the parents reimbursement for the cost of M.C.'s private school expenses during the spring 2012 school semester.