[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13456

Non-Argument Calendar

_____

I.S.,
by and through his attorney in fact, M.S.,
M.S.,
J.S.,

Plaintiffs-Appellants,

*versus*

FULTON COUNTY SCHOOL DISTRICT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02657-VMC

_____

Before NEWSOM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

I.S., a former student in the Fulton County School District, and his parents appeal the district court's judgment in favor of the District on their complaint under the Individuals with Disabilities Education Act. We affirm.

## I.

The Individuals with Disabilities Education Act (IDEA or the Act) requires participating states to provide a "free appropriate public education" to disabled children who meet the Act's criteria. *See* 20 U.S.C. § 1400 *et seq.*; *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). An appropriate education under the Act includes both instruction that is "specially designed" to "meet the unique needs" of the disabled child and sufficient supportive services to enable the child to benefit from that instruction. 20 U.S.C. § 1401 (9), (26), (29).

The Act provides detailed procedures for creating an "individualized education program," or IEP, to ensure that the required special education and related services are tailored to fit the needs

of the disabled child. *See id*. § 1414. An IEP is a "written statement" developed through collaboration between members of an IEP "team," including the child's parents, teachers, and school officials. *Id*. § 1414(d)(1)(A)–(B). The IEP sets out (among other things) "the child's present levels of academic achievement and functional performance," "measurable annual goals, including academic and functional goals," and "the special education and related services" to be provided to the child. *Id*. § 1414(d)(1)(A)(i). The local educational agency must ensure that the IEP team reviews the child's IEP at least annually and revises it as appropriate to address a lack of progress toward annual goals or other issues. *Id*. § 1414(d)(4). Ultimately, the Act requires an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403.

If the disabled child's parents believe that his IEP does not provide an appropriate education as required by the Act, they can unilaterally withdraw the child from his IEP school placement and pursue other options. *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1177 (11th Cir. 2014). Either the parents or the state can file a "due process hearing" request with the appropriate administrative agency to seek resolution of a dispute about the child's IEP or its implementation. 20 U.S.C. § 1415(b)(6), (f)(1)(A). And either party can appeal the administrative decision by filing a complaint in state or federal court. *Id*. § 1415(i)(2)(A).

If an appeal is filed in federal court, the district court will receive the administrative records and may hear additional

evidence if needed. *Id.* § 1415(i)(2)(C)(i)–(ii); *R.L.*, 757 F.3d at 1178. The court must then enter judgment based on a preponderance of the evidence, giving "due weight" to the administrative law judge's decision. 20 U.S.C. § 1415(i)(2)(C)(iii); *R.L.*, 757 F.3d at 1178 (quotation omitted).

The Act gives district courts broad discretion to grant whatever relief is "appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii); *see Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). This may include reimbursement of costs for an alternative school placement. *Burlington*, 471 U.S. at 370–71. Reimbursement is available for parents who reject an IEP and unilaterally pursue an alternative placement only if the state did not offer an IEP that would provide a "free appropriate public education," as required by the Act, and the alternative placement was appropriate for the child. *R.L.*, 757 F.3d at 1181.

## II.

I.S. is a young adult with autism and a history of severe anxiety, social phobia, depression, suicidal thoughts, and self-harm. In middle school and high school, he qualified for special education services under the IDEA as a student with an emotional behavior disorder and as a student with autism. He is very intelligent and capable of doing well academically, but he also has a history of refusing to go to school or do schoolwork.

I.S.'s school refusal began in 2012, during his first year of middle school. His parents, M.S. and J.S., withdrew him from the public school he attended and enrolled him at Eaton Academy, a

private day school in Atlanta with a low student-to-teacher ratio and individualized programs for students with special needs. I.S.'s school refusal and emotional challenges continued intermittently, and he changed schools three more times before returning to Eaton during the 2015–2016 school year.

That year, I.S. made great progress in overcoming his anxiety and school refusal. He took a full load of courses and earned As in every graded class. His parents believed that Eaton was a good fit for him and hoped that he would remain there through high school.

At the end of the 2015–2016 school year, I.S.'s parents filed an administrative action under the IDEA to compel the Fulton County School District to pay for I.S.'s education at Eaton. The District eventually agreed to reimburse I.S.'s parents for his past expenses at Eaton and pay his tuition there for the 2016–2017 school year. I.S.'s parents agreed that the District's payment of I.S.'s tuition and fees at Eaton would satisfy its obligations to provide a free appropriate public education for the 2016–2017 school year, unless I.S. experienced a significant change in functioning that warranted a change in placement or services. The parties agreed that if a significant change in functioning occurred, the IEP team would meet at the parents' request.

The parties developed an IEP for I.S. that placed him at Eaton for the 2016–2017 school year and provided that he would take a full load of classes needed to satisfy graduation requirements. But two weeks into the new school year, I.S. again refused to

attend school.  I.S.'s parents notified the District of the new school refusal, and the parties held a series of IEP team meetings attended by the parents, a representative of Eaton, the District's director of special education, a special education compliance coordinator, and a certified behavior analyst hired by the District.

Between September and December 2016, the IEP team remained in agreement that the goal was for I.S. to return to Eaton's campus and resume a full load of classes.  The behavior analyst retained by the District developed a plan to gradually reintroduce I.S. to Eaton over a period of several weeks to a few months.  In the meantime, the District offered to send a certified teacher to help I.S. with his schoolwork at home, and Eaton offered to provide course materials for the teacher to use so that I.S. could earn credit in all his classes.  But M.S. grew increasingly concerned with I.S.'s lack of academic progress as I.S.'s eighteenth birthday approached, bringing with it the possibility that I.S. would choose to drop out of high school without graduating.

In January 2017, the parents gave notice of their intent to enroll I.S. at a private residential school at the District's expense.  The District opposed the move, insisting that the parents had not given the District enough time to implement its plan to return I.S. to Eaton.  It prepared an IEP that maintained I.S.'s placement at Eaton and offered support from the behavior analyst to carry out her reentry plan, along with teaching assistance at home.  The District also offered to pay for counseling if the parents thought it would be helpful, but it did not include counseling in the IEP.

I.S.'s parents rejected the District's IEP as inadequate for I.S. They unilaterally withdrew I.S. from Eaton and enrolled him in an out-of-state residential therapeutic school. I.S. did very well at the therapeutic school for six months, before dropping out and transferring to a standard boarding school to finish his high school education.

The parents filed an administrative action under the IDEA, seeking to recover tuition and fees for I.S.'s six-month stint at the residential therapeutic school. The administrative law judge rejected the parents' claim, finding that the District's IEP offered an appropriate education for I.S.

The parents appealed the administrative decision to federal district court. The district court also sided with the District, and this appeal followed.

### III.

We review the district court's interpretation of the IDEA and its associated regulations de novo. *R.L.*, 757 F.3d at 1181. We review the district court's findings of fact for clear error—except to the extent that the findings are based solely on the administrative record, in which case "we stand in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not." *Id.* (quotation omitted).

"Whether a state- or parent-provided educational program provides an adequate education under the IDEA is a mixed

question of law and fact subject to *de novo* review." *Id.* at 1182. And we review the district court's decision to grant or deny relief under the IDEA for abuse of discretion. *J.N. ex rel. M.N. v. Jefferson Cnty. Bd. of Educ.*, 12 F.4th 1355, 1365 (11th Cir. 2021).

## IV.

When assessing whether a state has provided a free appropriate education as required by the IDEA, we consider whether the state has complied with the Act's procedural requirements, and whether the IEP developed for the child is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982); *CP v. Leon Cnty. Sch. Bd.*, 483 F.3d 1151, 1152–53 (11th Cir. 2007). Three related principles guide our interpretation of whether an IEP meets the IDEA's requirements. *First*, the "reasonably calculated" standard does not require the school district to be prescient about what will work for the child. The IDEA requires an IEP that is reasonable, not foolproof. *See Endrew F.*, 580 U.S. at 399. *Second*, the IDEA does not require an IEP that maximizes the child's educational potential or provides the best possible education. *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade Cnty.*, 437 F.3d 1085, 1102–03 (11th Cir. 2006). The IEP must be designed to provide "educational benefit" for the child. *Rowley*, 458 U.S. at 200. "When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Endrew F.*, 580 U.S. at 402. For a child who is not able to attend school in a regular classroom, the IEP must be

"appropriately ambitious in light of his circumstances." *Id.* And *third*, the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 404.

As the party seeking relief in the administrative action and the losing party in the district court, the parents bear the burden of establishing that the District violated the IDEA. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003).

## A.

We begin with the parents' procedural challenges. Non-compliance with a procedural requirement violates the IDEA only if the procedural error (1) "impeded the child's right to a free appropriate public education"; (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education" to their child, or (3) "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015). In other words, a party seeking relief based on a procedural violation of the Act must show that the violation caused substantive harm. *J.N.*, 12 F.4th at 1366.

The parents argue that the District violated the IDEA's procedural requirements by (1) predetermining I.S.'s school placement before the January 26, 2017 IEP meeting; and (2) not providing a revised IEP, a functional behavior assessment, or a behavior

intervention plan for I.S.[1] We conclude that if any procedural violations occurred, they caused no substantive harm.

## 1.

"Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team." *R.L.*, 757 F.3d at 1188. "To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child." *Id.* That is not to say that the school district's representatives cannot form opinions about the best course for the child before meeting with the parents, or that the state must agree to the parents' requests. *See id.*; *K.A. ex rel. F.A. v. Fulton Cnty. Sch. Dist.*, 741 F.3d 1195, 1206 (11th Cir. 2013) (neither side has "veto"

---

[1] The parents also assert that the District "withheld critical educational records," including the behavior analyst's scheduling log, I.S.'s and M.S.'s "right to confidentiality" with the behavior analyst (apparently referring to a consent form signed by J.S.), and unspecified "communications" between the behavior analyst and the District's special-education director. Although the parents' arguments are unclear, their complaint appears to be that the District's late production of the documents disadvantaged them in the administrative proceeding. The parents do not make any meaningful argument that the delay in production impeded their participation in the IEP process culminating in the January 2017 IEP at issue or the provision of a free appropriate public education to I.S. We therefore reject this procedural challenge without further discussion. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014).

power in the IEP process, and the IEP team may alter the IEP without the parents' consent); *see also Rockwall Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 339 (5th Cir. 2016) (parents have a "right to provide meaningful input," not a "right to dictate an outcome" (quotation omitted)).

The parents argue that the District predetermined I.S.'s placement before the IEP meeting on January 26, 2017, because it refused to consider any placement other than home schooling. We disagree.

As an initial matter, the District never proposed changing I.S.'s school placement to home schooling. Instead, it consistently tried to implement the August 2016 IEP developed by agreement with I.S.'s parents, which placed I.S. at Eaton. Until January 2017, all the members of the IEP team—including I.S.'s parents—agreed that the goal was for I.S. to return to Eaton and finish high school there. The District continued to pursue that goal until I.S.'s parents withdrew him from Eaton and enrolled him in a private residential school. Although the District's director of special education (Tris Gilland) repeatedly proposed having a teacher work with I.S. at home so that he did not fall behind academically, it was clear that the suggestion was intended as a stop-gap measure rather than a permanent placement.

Moreover, the record supports the conclusion of the administrative law judge and the district court that I.S.'s parents were able to participate fully in the IEP process, and that the District's representatives listened to the parents' concerns and considered their

suggestions. When M.S. mentioned the parents' preferred school for the first time at the December 21, 2016 IEP meeting, Gilland did not reject the idea out of hand as the parents contend. M.S. suggested that John Dewey Academy (a residential therapeutic school in Massachusetts) was an "option" for I.S., but also said that Eaton remained an option as well. Gilland responded that the District would be happy to look into what John Dewey had to offer, but in the meantime, the team would continue to try to implement the existing IEP at Eaton.

At the next IEP meeting on January 26, 2017, Gilland and the other members of the IEP team again listened to the parents' concerns about I.S.'s progress. The entire IEP team engaged in a long, civil discussion about whether to continue with the behavior analyst's reintegration plan or transfer I.S. immediately to a residential school. Gilland said that she had researched John Dewey Academy, as requested, and she listened to M.S.'s description of the school and the reasons he thought the placement was appropriate for I.S.

Ultimately, the education program Gilland offered on behalf of the District remained unchanged from previous IEP meetings: placement at Eaton at the District's expense, continued support from the behavior analyst to gradually work through I.S.'s school refusal and return him to on-campus classes, home-schooling assistance by a certified teacher in the meantime, and optional family counseling services paid for by the District. But the fact that Gilland did not change her mind about the previously agreed-upon

23-13456            Opinion of the Court                13

plan for I.S. to return to Eaton does not mean that I.S.'s school placement was predetermined.[2] *See R.L.*, 757 F.3d at 1188; *K.A.*, 741 F.3d at 1206. The parents were given a meaningful opportunity to participate in the IEP process, and the record indicates that the other members of the IEP team seriously considered their concerns and preferences.

**2.**

I.S.'s parents also argue that the District violated the IDEA by failing to make changes in writing to I.S.'s IEP between August 2016 and January 2017 and failing to provide a functional behavior assessment and behavior intervention plan. They contend that these procedural failures impeded their right to participate in the IEP process, and the failure to provide a behavior assessment and plan deprived I.S. of educational benefits. Again, we disagree.

Regarding written changes to the IEP, we note that the IDEA requires the IEP team to review the child's IEP at least annually and revise it "as appropriate." 20 U.S.C. § 1414(d)(4)(A)(i)–(ii).

---

[2] In support of their predetermination claim, I.S.'s parents also attempted to supplement the record in the district court with an audio recording of District employees meeting with one of the District's attorneys—a recording that the administrative law judge and the district court concluded was protected by the attorney-client privilege. We do not need to review the privilege determination to determine that the district court acted within its discretion in denying the parents' motion to supplement the record. Even if the recording shows (as the parents allege) that District representatives pressured the school psychologist to add a recommendation for continued behavioral support to her report, that does not mean that the District refused to consider the parents' requested placement—and the record as a whole indicates otherwise.

This does not mean that the team is required to revise the IEP after every team meeting, or even that they must immediately amend the IEP any time services are added or changed to meet a time-sensitive but temporary need.

In any event, assuming for the sake of argument that the failure to revise I.S.'s IEP before January 2017 violated the Act's procedural requirements, that technical violation caused no substantive harm. The August 2016 IEP was developed by agreement with I.S.'s parents, and the IEP team continued trying to implement that program until the parents unilaterally withdrew I.S. from Eaton. Until then, I.S.'s school placement remained the same (Eaton), and his goals of completing high school at Eaton, improving his social and emotional well-being, and preparing for college, employment, and independent living also remained the same.

The team did not formally revise the written IEP to add the goal of addressing I.S.'s school refusal and returning him to Eaton, but everyone—including I.S.'s parents—understood that to be the purpose of the IEP team meetings in September, November, and December 2016. At each of those meetings, the team exhaustively discussed I.S.'s school refusal, the plan to persuade I.S. to return to Eaton, his progress toward achieving that goal, and additional actions or services that might be helpful. The failure to revise the written IEP did not impede the parents' active participation in those discussions or the availability of instruction and services to I.S.

Similarly, the fact that the behavior analyst did not conduct a complete functional behavior analysis or produce a behavior intervention plan did not impede the parents' ability to participate in the IEP process or deprive I.S. of any educational benefits. After meeting with I.S. several times, the behavior analyst decided that a functional analysis and behavior intervention plan were not necessary or appropriate for I.S., in part because she was unable to observe I.S. at Eaton as she initially expected to do. But she gathered sufficient information from I.S. and his parents between late September and mid-November 2016 to form a hypothesis about the function of I.S.'s school refusal and develop a plan for a gradual "demand fading" process that would lead to his return to Eaton.

And although the behavior analyst did not produce a written report until January 2017, she kept the parents and other IEP members fully informed about her observations and assessments, the plan she developed, and I.S.'s progress in completing each step of the plan. The parents initially agreed with her plan and generally cooperated in its implementation for several weeks before transferring I.S. to John Dewey Academy. I.S., after initially resisting the idea of returning to Eaton, progressed from staying in his bedroom and refusing to do any schoolwork to willingly meeting the behavior analyst at coffee shops and libraries and completing assignments during those visits and on his own at home. Although the parents allege vaguely that they relied on the District to provide a functional assessment and behavior intervention plan, they have not shown that the failure to provide those items had any impact on

their participation in the IEP process, their decisions about I.S.'s education, or the educational benefit available to I.S.

## B.

Substantively, I.S.'s parents argue that the IEPs developed for I.S. between September 2016 and January 2017 failed to provide a "free appropriate public education" as required by the IDEA. Specifically, they argue that the IEPs were inadequate because they provided a "segregated, restrictive home placement," enrollment in only two virtual courses, insufficient academic assistance to allow I.S. to make progress in those courses (much less the full course load required for graduation), and none of the counseling, therapy, social-skills or life-skills services I.S. required.

As we have explained, the record contradicts the parents' assertion that I.S.'s IEPs provided for home schooling. The school placement in all the relevant IEPs remained the same as agreed upon by the parties in August 2016: Eaton Academy. The parents agreed that Eaton could meet I.S.'s educational and social needs, if he could be persuaded to attend school on campus. To achieve that objective, the District engaged a certified behavior analyst, who developed a plan to address I.S.'s school refusal. The District's offer to provide a teacher to help I.S. complete virtual lessons at home was intended to prevent I.S. from falling behind academically while the behavior analyst implemented her plan—as Gilland explained more than once at successive IEP meetings.

The parents argue that the District effectively changed I.S.'s placement to home schooling by failing to accomplish his return to

Eaton over a five-month period.  They blame the District for the delay in implementing the behavior analyst's school reentry plan, and for I.S.'s lack of academic progress in the meantime.

The record shows, however, that the District consistently requested more access to I.S. for behavioral and academic support than the parents were able to provide.  J.S., with whom I.S. lived, had a variable and unpredictable work schedule and often could not accommodate the behavior analyst's meeting requests.[3]  In October 2016, for example, the behavior analyst offered seven dates to meet with I.S., but J.S. accepted only two.  At the November 2016 IEP meeting, the District pressed for more frequent visits with I.S., and J.S. initially agreed to be available on a set schedule three days per week.  But she almost immediately retracted her agreement, saying that her work schedule would be busier than usual during the holiday season.  Because the behavior analyst's plan called for a set number of visits with I.S. at different locations before reintroducing him to Eaton, the difficulty scheduling those visits with the desired frequency contributed to the delay in implementing the plan.

---

[3] The parents point out that M.S. offered to schedule the meetings at M.S.'s office.  But the behavior analyst and M.S. agreed that because of his relationship with his parents, I.S. would be more comfortable with J.S. present rather than M.S.  And because the meeting locations—J.S.'s home (where I.S. lived), a coffee shop, a library, and then Eaton—were carefully chosen based on I.S.'s response to them, holding the meetings at M.S.'s office was not a practical solution to the scheduling problems.

The parents also turned down academic assistance offered by the District.  At every IEP meeting, Gilland and the behavior analyst expressed concern for I.S.'s lack of academic progress and suggested that in-home teaching assistance would be helpful.  In November 2016, they explained that the "demand fading" process to return I.S. to Eaton would be a slow one, and that even if I.S. did not need academic assistance, a teacher could initiate and monitor I.S.'s online class sessions and help provide a consistent schedule for I.S. to follow at home.  The behavior analyst also explained that I.S. showed no interest in returning to Eaton, and she suggested that the parents ask Eaton to give I.S. remote access in more than just two classes.

In December 2016, the behavior analyst informed the parents that I.S. had completed only a few lessons in the two online courses he had access to and had stopped logging on to Eaton's virtual portal after failing a geometry assessment twice.  She also said that I.S. was receptive to—and needed—teaching assistance to progress in his geometry class.  And Eaton's representative suggested switching from the virtual program to a system that used Eaton's written course materials, which would permit I.S. to take a full load of classes and work at an accelerated pace.

But the parents expressed no interest in teaching assistance and resisted enrolling I.S. in additional online or home-taught courses.  M.S. emphasized that I.S. needed the social benefits of attending Eaton in person and worried that if I.S. were allowed to do more of his schoolwork at home, he would never return to

campus. And J.S. maintained that she and M.S. had no concerns about I.S.'s academics. The parents cannot now complain that the District failed to provide I.S. with a full course load and adequate instruction to progress through his high school curriculum.

The parents' argument that the January 2017 IEP failed to provide sufficient education and related services falls flat for similar reasons. The IEP placed I.S. at Eaton with two hours per week of support from the behavior analyst and four hours per week of home instruction by a certified teacher, and the District offered to add counseling. This program was "reasonably calculated to enable [I.S.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S. at 403. But the parents withdrew I.S. from Eaton and transferred him to a residential school without giving the District an opportunity to fully implement the IEP.

By the time the January 2017 IEP was written, I.S. had begun to make significant progress in the behavior analyst's plan to reintegrate him back into Eaton. The handful of visits the behavior analyst was able to schedule in October and November 2016 were dedicated to introducing herself to I.S. and investigating the reasons for his school refusal. She began to implement her systematic reentry plan in mid-December 2016, and had seven additional meetings with I.S. before the January 26, 2017 IEP meeting. In that time, I.S. progressed from refusing to do any schoolwork at home to willingly meeting the behavior analyst at a coffee shop, logging on and working on class assignments for the duration of the visit, setting goals for himself to complete additional assignments

independently, and completing the additional assignments without assistance. Based on his progress, the behavior analyst was optimistic about reintroducing I.S. to Eaton in a few more weeks, if she could schedule visits with the desired frequency. As it turned out, I.S. successfully completed two additional visits at a public library the week after the IEP meeting—which meant that if all had gone according to plan, I.S. would have returned to Eaton the following week.

The four hours of teaching assistance offered in the January 2017 IEP was also reasonably calculated to provide I.S. with educational benefits. Representatives of Eaton emphasized that they could tailor I.S.'s education to his needs, whether that involved him completing work at Eaton in a classroom or study hall or working remotely from home with the assistance of a District-provided special-education teacher. They also offered to provide classroom materials that would allow I.S. to complete his lessons at an accelerated pace. And J.S. informed the District that when I.S. received "hospital homebound" instruction in the past, he had earned As in all his classes with only two hours per week of assistance from a teacher provided by the District. Because the parents suggested that I.S. needed less teaching assistance than the IEP provided, and because they never took advantage of the home-based instruction the District offered, they cannot meet their burden of showing that the IEP was deficient in this regard.

Finally, we reject the parents' argument that the IEP lacked sufficient "related services" to enable I.S. to benefit from the

academic instruction offered in the IEP. The parents argue that I.S.'s needs could only be met by transferring him to a highly structured residential school with intensive therapy and life-skills training, but the record does not support their argument. Before withdrawing I.S. from Eaton and enrolling him in a residential school, the parents consistently maintained that I.S. was capable of progressing academically with minimal instruction, and that his social and emotional needs could be met at Eaton if he attended school on campus. They informed the District that they had engaged a therapist and a psychiatrist for I.S., and although Gilland twice offered additional counseling at the District's expense, they did not take her up on the offer. In addition, the parents identified I.S.'s tendency to shut down and quit when he encountered any difficulty as a significant recurring problem for him. For this reason, the behavior analyst believed that it was in I.S.'s best interest to learn to work through his school refusal. The IEP offered by the District was reasonably calculated to address that need.

## V.

Under the circumstances here, the record does not support the parents' argument that the District failed to offer I.S. a free appropriate public education, as required by the IDEA. We therefore affirm the district court's judgment in the District's favor.

**AFFIRMED.**