# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10458

United States Court of Appeals
Fifth Circuit

**FILED**
February 26, 2020

Lyle W. Cayce
Clerk

R. S., by and through his next friend, RUTH B.,

     Plaintiff - Appellant

v.

HIGHLAND PARK INDEPENDENT SCHOOL DISTRICT,

     Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, JONES, and DENNIS, Circuit Judges.

PER CURIAM:

R.S. is a developmentally disabled child who attended school and received special education services in Highland Park Independent School District ("Highland Park") within the Dallas-Fort Worth metropolitan area. Through his next friend, his mother Ruth B., R.S. brought a state administrative complaint alleging that the school district violated the Individuals with Disabilities Education Act ("IDEA") by failing to develop and implement an Individual Education Plan (or Program) ("IEP") that was reasonably calculated to provide him with educational benefits appropriate to his circumstances. R.S.'s claims are based primarily on allegations that Highland Park allowed him to fall and injure himself on several occasions, as

No. 19-10458

well as generalized disagreements about the educational methods Highland Park employed. He sought reimbursement for the cost of the private schooling and supplemental services he utilized after he unilaterally withdrew from the school district.

Following a state administrative hearing, the hearing officer concluded that any of R.S.'s IDEA claims that had accrued more than a year prior to his requesting a hearing were barred by Texas's statute of limitations, which IDEA incorporates, and that the remainder of his claims were without merit. R.S. challenged the ruling in the U.S. District Court for the Northern District of Texas. The court affirmed the administrative decision on summary judgment and dismissed R.S.'s remaining claims, and he now appeals. Because we agree that R.S. has failed to demonstrate an IDEA violation, we AFFIRM.

## I.

## A.

R.S. suffers from hypotonia, cortical visual impairment ("CVI"), cerebral palsy, and West Syndrome. As a result, R.S. is non-verbal and non-ambulatory, he has significant optical processing delays and other visual impairment, and he requires assistance for safe participation in all physical activities. This is partially because R.S. does not have automatic protective responses to prevent or minimize injury when he falls or is otherwise threatened with physical harm.

After moving from Virginia to Texas with his mother, Ruth B., R.S. enrolled in Highland Park in January 2012 as a second grader at Hyer Elementary School. Highland Park initially provided R.S. with special education services based on the IEP[1] that his former school district in Virginia

---

[1] Required by IDEA, an IEP is a "written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *Cypress-Fairbanks lndep. Sch. Dist. v. Michael F.*

had developed. However, the school district soon realized that the existing IEP contained academic goals that did not comport with R.S.'s then-current abilities.

The school district performed its own Full and Individual Evaluation ("FIE") of R.S. from January to May 2012, and on May 11, it classified R.S. as meeting the disability criteria for "intellectual disability, visual impairment, speech impairment, orthopedic impairment, other health impairment (epilepsy), and multiple disabilities." The FIE was submitted to R.S.'s Admission, Review, and Dismissal Committee ("ARD Committee"), the administrative stake-holder's group responsible for making decisions about a student's IEP under Texas law. R.S.'s ARD Committee certified that R.S. met eligibility requirements for special education and related services and adopted a new IEP.

Pursuant to his IEP, R.S. worked with a specialist team that included a teacher of the visually impaired ("TVI"), an assistive technology ("AT") coordinator, a speech language pathologist, an occupational therapist, a physical therapist, a special education teacher, a music therapist, and an adaptive physical education ("PE") teacher. R.S. utilized a variety of equipment during his lessons, including a wheelchair for basic mobility; a

---

*ex rel. Barry F. ("Michael F")*, 118 F.3d 245, 247 (5th Cir. 1997). An IEP must include "a statement of the child's present levels of academic achievement and functional performance," a description of "how the child's disability affects the child's involvement and progress in the general education curriculum," and "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be measured. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. REI ("Endrew F.")*, 137 S. Ct. 988, 994 (2017) (quoting 20 U.S.C. §§ 1414(d)(l)(A)(i)(I)-(III)). The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." *Id.* (quoting 20 U.S.C. §§ 1414(d)(l)(A)(i)(IV)). In short, an IEP is "the centerpiece of [IDEA's] education delivery system for disabled children." *Id.*

standing frame for trunk and leg stretching and lower extremity weight bearing; a gait trainer for daily mobility practice; a "Little Room" that provided him with a safe environment for independent play and sensory-based exploration; and a specialized seat called a "Kaye bench" to work on his postural control.  R.S. also used an iPad as an augmented alternative communication ("AAC") device.  R.S. and his team employed the AAC device as part of an "object-picture-symbol hierarchy," under which R.S. would first be given an object to hold, then a picture of the object to view, then a symbol representing the object on his iPad to use in communicating.

## B.

While attending Highland Park schools, R.S. suffered five falls over the course of three years, which he claims demonstrate Highland Park failed to properly ensure his safety.[2]

The first three incidents occurred while R.S. was attending Hyer Elementary.  First, in October 2012, R.S. fell forward off his Kaye bench while working with an occupational therapist.  The bench was eight to nine inches from the ground at the time, and R.S. struck his face on the floor, causing an area under his left eye to become swollen.  Following the incident, Highland Park implemented a new protocol that required a second teacher or aide to be present when R.S. was working with a specialist.

---

[2] Below and before the administrative hearing officer, R.S. alleged that several other incidents occurred that demonstrated Highland Park's indifference to his basic needs, including occasions in which the school district allegedly left him sitting in feces, failed to properly treat pressure sores that developed on his tailbone, allowed him to fall into the toilet, utilized a "prisoner hold" when transferring him between chairs, used equipment that he had outgrown, and put his orthotics on the wrong feet.  The administrative hearing officer and the district court found that, to the extent the evidence supported incidents that loosely fit these characterizations occurring at all, the school district acted appropriately and properly addressed R.S.'s needs on each occasion.  R.S. does not raise these allegations before this court.

R.S. suffered a second injury a year later in October 2013. While R.S. was using his standing frame, his upper body fell forward and he struck his face on an iPad that one of his aides was holding in front of him. R.S.'s face became red and he experienced swelling around the area of impact. Following the incident, Highland Park purchased a soft foam case and stand for R.S.'s iPad and implemented a new protocol requiring that personnel be within arm's length of R.S. at all times. When Ruth B. expressed concerns to Highland Park about subsequent behavioral problems that she believed were linked to this injury, Highland Park performed a "functional behavior assessment" and developed and implemented a "behavior intervention plan."

The following month, R.S. suffered a third fall. R.S. rolled off a one-and-a-half-foot tall cot used as a changing table when an aide stepped away to dispose of his diaper. He again struck his face, resulting in a black eye and swelling. As a result of the incident, Highland Park installed a safety belt on the changing table and instituted a new protocol for changing R.S. that included additional safety precautions.

In the summer of 2014, R.S. again fell off a Kaye bench and struck his face while working with a TVI and an aide during Highland Park's Extended School Year service at Armstrong Elementary. Though the school nurse noted only a slight abrasion on his upper lip, R.S. later developed bruising and swelling around his eye. In response to the incident, Highland Park assured R.S.'s parents that they would review R.S.'s IEP and take whatever measures were necessary to ensure his safety.

R.S. transferred to McCulloch Middle School for the 2014-15 school year. On September 14, R.S. fell a fifth time after he leaned too far forward while seated and wearing a seatbelt in his "office chair," a rolling chair without wheel-locks that a Highland Park physical therapist procured after witnessing R.S. demonstrating good posture in a similar chair during a visit to his home.

No. 19-10458

When his aides turned away, R.S. tilted forward until his forehead contacted the floor, and he developed an oval abrasion on his forehead as a result. In response to his injury, Highland Park began holding additional staff trainings every three weeks to cover safety protocols for R.S.'s care and instruction, implemented a new safety protocol mandating that at least two people be with R.S. any time he was out of his wheelchair, and began to require that a different primary aide work with R.S. in the afternoon than in the morning to avoid fatigue.

## C.

At an ARD Committee meeting in October 2013, one year after Highland Park had adopted its IEP for R.S., the Committee considered R.S.'s progress under the new plan. At the meeting, Highland Park acknowledged that R.S. had experienced some regression in skills over the previous year. Although Highland Park stated that much of the perceived regression was attributable to human error in the way data was recorded, the school district conceded that some true regression had occurred. The school district agreed to implement standardized "operational definitions" and a number of other measures to correct for mistakes in recording data, as well as monthly collaborative meetings with R.S.'s parents, teachers, and service providers.

In discussing compensatory services to correct for the regression, R.S.'s parents requested that Highland Park issue a referral for R.S. to attend the Texas School for the Blind and Visually Impaired ("TSBVI"). Though Highland Park was initially resistant to the suggestion because TSBVI represented a very "restrictive environment away from typically developing peers and family members," R.S.'s parents continued to advocate for the placement, and the school district eventually agreed to make the referral and to apply to TSBVI's outreach program.

No. 19-10458

TSBVI did not accept R.S. for admission, stating that, based on its evaluation, Highland Park was already providing R.S. with a "Free Appropriate Public Education" ("FAPE")[3] and that R.S. would "continue to have meaningful instructional opportunities within [the Highland Park] community." TSBVI nonetheless agreed to provide supplemental services to Highland Park through its outreach program, and Scott Baltisberger, a TSBVI specialist consultant, visited the school district four times between April 2014 and March 2015. After viewing R.S.'s daily activities and visiting his home, Baltisberger made a series of recommendations for R.S.'s education. Most notably, he recommended slowing down the pacing of R.S.'s instruction, focusing more on functional skills and less on academic concepts, and adopting a specialized technique developed for educating children with visual impairments called Active Learning. R.S.'s parents initially opposed Baltisberger's recommendations because they felt the suggestions emphasized skills R.S. had already accomplished and they wished to keep R.S.'s academic goals in place. Although they ultimately agreed with Baltisberger's suggestions and the ARD Committee incorporated the recommendations into R.S.'s IEP, R.S.'s parents continued to voice concerns over the following year that the goals represented steps backward for R.S.[4]

---

[3] A FAPE is a term of art that means a special education and supplemental services that comply with all IDEA requirements. *See Endrew F.*, 137 S. Ct. at 993 (citing 20 U.S.C. § 1412(a)(1)).

[4] Specifically, R.S.'s parents objected to Baltisberger's recommendation that R.S. use more objects and fewer pictures when communicating. In response to the parents' concerns, Baltisberger, Highland Park, and the parents agreed to use both objects and pictures. Similarly, R.S.'s parents took issue with the school district's use of physical switches with pictures as a stage in the object-picture-symbol hierarchy prior to adding a symbol to R.S.'s iPad, stating that this appeared to be a step backward from the techniques R.S. had employed in Virginia.

No. 19-10458

### D.

On April 13, 2015, R.S. requested a due process hearing—an administrative procedure that IDEA requires that states or local school districts establish to afford parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6), (f)(1)(A).

Approximately a week later, Ruth B. submitted an application for R.S. to attend Chase's Place, a very small special needs private school with only ten children in attendance. R.S. began attending Chase's Place in June 2015. On August 24, 2015, R.S.'s parents provided Highland Park with written notice that R.S. would not be attending the district's schools for the 2015-16 school year.

A live hearing was held on May 9-11, 2016, and the hearing officer issued a decision on July 19, 2016, finding that Highland Park had not violated IDEA. Accordingly, the hearing officer denied R.S. any relief, including reimbursement of the expenses associated with attending Chase's Place.

R.S. filed a timely complaint in the U.S. District Court for the Northern District of Texas pursuant to 20 U.S.C. § 1415(i)(2)(A), which creates a federal cause of action to appeal the result of a state or local IDEA due process hearing.[5] The parties each moved for summary judgment with respect to R.S.'s IDEA claim.[6] On March 8, 2019, the district court issued a memorandum opinion and order denying R.S.'s motion and granting Highland Park's.

---

[5] In addition to his claim for a violation of IDEA, R.S. asserted a 42 U.S.C. § 1983 claim based on Highland Park's alleged violation of his constitutional right to bodily integrity guaranteed by the Due Process Clause of the Fourteenth Amendment and a claim for disability discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

[6] In this context, where neither party requested that the district court hear additional evidence, a summary judgment motion is "the procedural vehicle for asking the judge to

No. 19-10458

The court first considered the hearing officer's ruling that Texas's one-year statute of limitations, which IDEA incorporates, served to bar consideration of any of R.S.'s claims that accrued more than a year before his due process hearing request. The court rejected R.S.'s argument that two statutory exceptions to the limitation period applied, finding that Highland Park had not prevented R.S. from requesting a hearing by either misrepresenting that it had resolved the problem or withholding information IDEA required the school district to provide. The court therefore ruled that any of R.S.'s claims that accrued prior to April 13, 2014, were time barred.

The district court then turned to whether Highland Park had violated IDEA by denying R.S. a FAPE. The court observed that under Supreme Court precedent, a school district must design and implement an IEP that is reasonably calculated to allow the child to make progress appropriate in light of the child's circumstances. Applying the four-factor test that this circuit employs to evaluate whether an IEP meets this requirement, the court found that R.S.'s program was individualized based on his assessments and performance, administered in the least restrictive environment appropriate to his needs, developed and implemented through coordination and collaboration with key stakeholders, and in fact resulted in positive academic and non-academic benefits to R.S. The court accordingly concluded that Highland Park had provided R.S. a FAPE as IDEA requires.[7]

---

decide the case on the basis of the administrative record." *Rockwall Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 338 n.4 (5th Cir. 2016) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997)).

[7] The court went on to conclude that even if Highland Park had violated IDEA, R.S. had not established that Chase's Place was an appropriate private placement that would remedy the violation. Two weeks later, the court issued a second memorandum opinion and order *sua sponte* dismissing R.S.'s § 1983 and Rehabilitation Act claims. Applying the legal framework for issue preclusion or collateral estoppel, the court concluded that the issues of fact underlying these claims were litigated and decided in resolving R.S.'s IDEA claim. Accordingly, the court dismissed all of R.S.'s remaining claims.

No. 19-10458

## II.

This court reviews a district court's determination as to whether a school district has provided a FAPE under IDEA as a mixed question of fact and law. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012) (citing *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir.1993)). The district court's legal conclusions are reviewed *de novo*, while "findings of 'underlying fact' are reviewed for clear error." *Id.* "Whether the student obtained educational benefits from the school's special education services is a finding of underlying fact." *Id.*

The district court's own review of a state hearing officer's IDEA decision is "virtually *de novo*." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (quoting *Teague*, 999 F.2d at 131). Although the district court is required to give due weight to the hearing officer's findings, the court ultimately must arrive at its own independent decision based on the preponderance of the evidence. *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009). The Supreme Court has cautioned, however, that this standard is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).

## III.

### A.

As an initial matter, R.S. contends that the district court erred by determining that Texas's one-year statute of limitations barred consideration of any of his IDEA claims that arose prior to April 13, 2014. 20 U.S.C. § 1415(b)(6)(B) specifies that a party may request a due process hearing "in such time as the State law allows." 19 Tex. Admin. Code § 89.1151(c) in turn provides, "A parent or public education agency must request a hearing within

10

No. 19-10458

one year of the date the parent or public education agency knew or should have known about the alleged action that serves as the basis for the request."  The parties agree that Texas's one-year statute of limitations is controlling unless one of the statutory exceptions applies.

Applying this statute of limitations in this case is made more complicated because R.S. does not clearly link his challenge to a specific formal decision by Highland Park, instead appearing to argue simply that all of the IEPs Highland Park designed and implemented were generally faulty.  *Cf. Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 (5th Cir. 2009) (sustaining a challenge to the specific IEP that the school offered after it refused parents' request for private placement).  20 U.S.C. § 1415(b)(6)(B) states that the statute of limitations for an IDEA claim begins to run when "the parent or public agency knew or should have known about the alleged *action* that forms the basis of the complaint," suggesting that a parent must challenge an affirmative act or decision on the part of the school district in order to establish an IDEA violation (emphasis added).  Other circuits have stated that the injury that causes an IDEA claim of this sort[8] to accrue "is an allegedly faulty IEP or a disagreement over the educational choices that a school system has made for a student." *R.R. ex rel. R. v. Fairfax Cty. Sch. Bd.*, 338 F.3d 325, 332 (4th Cir. 2003); *see also M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 222 (2d Cir. 2003) (noting that, under Connecticut's statute of limitations, "[t]he limitations period generally begins at the time the school

---

[8] IDEA claims may also be based on, for example, a school district's failure to follow proper procedures in developing an IEP, *see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 205 (1982), to properly implement an IEP, *see Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007), or to identify that a child requires special education in the first place. *See Spring Branch Indep. Sch. Dist. v. O.W. by next friend Hannah W.*, 938 F.3d 695, 706 (5th Cir. 2019).  R.S. has alleged only a substantive violation based on his IEP not being reasonably calculated to produce educational benefits.

11

No. 19-10458

board declines to make the educational change desired by the parents or at the time it proposes an educational change that the parents deem unsuitable").

Thus far, this circuit has not expressly limited this sort of IDEA claim to instances in which a school district affirmatively acts or refuses to act to create or change an IEP. We now hold that a claim challenging the substantive sufficiency of an IEP must be linked to a specific act adopting, changing, or declining to change the IEP, and such a claim accrues when a parent knew or should have known that the action resulted in a deficient IEP. In instances in which a parent objects to a specific education choice, the alleged unsuitability of the IEP will generally be immediately apparent when the school district adopts, changes, or refuses to change the IEP. Where, as here, the claim is instead based on a generalized allegation that an IEP is not reasonably calculated to confer benefits, accrual will depend on the more fact-intensive inquiry of when the alleged deficiency became sufficiently apparent that the parent knew or should have known of the problem, including from a child's lack of progress under the IEP.

In the present case, it is unnecessary for us to engage in this factual analysis because, even if we assume *arguendo* that R.S. is able to challenge all of the IEPs that Highland Park designed and implemented, we ultimately do not identify an IDEA violation.

## B.

R.S. argues that the district court erred by concluding that Highland Park provided him with a FAPE because his IEP was substantively inadequate.[9]   The Supreme Court has stated that IDEA's procedural

---

[9] R.S. alleges that Highland Park failed to sufficiently collaborate with his parents because it did not adequately respond to their urging to take greater care regarding R.S.'s safety and skill levels. A failure to collaborate with parents when designing an IEP can give rise to a procedural violation. *See, e.g., T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016). However, this court has held that it is also relevant to whether an IEP is

requirements are significantly more defined and demanding than its substantive requirements and "that adequate compliance with the procedures prescribed [will] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).[10] Nevertheless, a school may violate IDEA by imposing an IEP that is not "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207. For a child integrated into the general classroom, this test is satisfied when the IEP is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. When this is not the case, a child's "IEP need not aim for grade-level advancement" if that is not "a reasonable prospect for the child." *Endrew F.*, 137 S. Ct. at 1000. "But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.*

An IEP need not maximize a child's potential in order to comply with IDEA. *Rowley*, 458 U.S. at 207. "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999. This court employs a four-factor test first articulated in *Michael F.* when performing this evaluation. *See* 118 F.3d at 253. Under *Michael F.*, whether an IEP is reasonably calculated to confer educational benefits depends on whether

> (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in

substantively adequate, *see R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 812 n. 8 (5th Cir. 2012), and R.S. only addresses the allegations in this context.

[10] *Rowley* and other older cases interpreted the Education of the Handicapped Act, the IDEA's statutory predecessor. The language relevant to this case is unchanged between the two statutes, except that the law now refers to "children with disabilities" instead of "handicapped children." *See Rowley*, 458 U.S. at 206.

the least restrictive environment [appropriate for the child's needs]; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated.

*Id.* We have not held "that district courts must apply the four factors in any particular way," and, accordingly, a district court does not legally err "by affording more or less weight to particular *Michael F.* factors." *Michael Z*, 580 F.3d at 294. Here, the district court properly considered each of the four factors and concluded that they all weighed in favor of Highland Park.

### 1.

IDEA contains several statutory individualized considerations that school districts must account for when designing an IEP. Pursuant to 20 U.S.C. § 1414(d)(3)(A), an IEP team should consider "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." The district court found that Highland Park properly examined each of these factors when it designed an IEP that was based off its own evaluations; R.S.'s present levels of academic achievement and functional performance ("PLAAFP"); a number of outside reports, including the 2012 FIE, a 2014 functional behavioral analysis ("FBA"), a 2014 orientation and mobility evaluation ("O&M Evaluation"), a 2015 FIE, the TSBVI Outreach Program consultation reports, multiple 2015 functional vision evaluation and learning media assessments, and an eye exam report from Dallas Services; and input from R.S.'s parents and private therapists and specialists.

R.S. contends that his IEP was not properly individualized because Highland Park (l) did not minimize R.S.'s risk of injury, which was necessary for him to learn properly; (2) did not take sufficient account of R.S.'s documented skills when he was attending school in Virginia, such that it did

not recognize R.S.'s regression until it was too late; and (3) did not fully implement the recommendations provided by its evaluators and outside consultants. The district court rejected each of these arguments.

**a.**

With respect to the safety argument, R.S. relies heavily on the expert testimony of Dr. Jan Van Dijk at the administrative hearing. Dr. van Dijk was qualified as "an expert in the field of multi-sensory impairment, including the education of children with severe multiple disabilities, including visual, hearing, or a combination of the two." Dr. van Dijk testified that the type of injuries R.S. suffered could constitute stressors that would compromise his long-term ability to learn, in part due to elevated levels of a neurochemical called cortisol in his brain that resulted from the traumatic experiences.

The district court found that Dr. van Dijk conducted only a very informal and abbreviated observation of R.S. and was unaware the R.S. was attending Chase's Place at the time of his evaluation and that Dr. van Dijk premised his opinions entirely on the assumption that the allegations contained in R.S.'s due process hearing complaint were accurate. The court concluded that there was no other evidence in the record indicating that the injuries were serious or the product of malice or neglect, nor that they had any long-term effect on R.S.'s ability to learn. And the court noted that the TSBVI recommendations stated that the school district should "[l]et safe accidents happen" to allow R.S. the opportunity to learn from his mistakes. The court thus found that R.S. had not demonstrated that his falls had rendered Highland Park incapable of providing him with an individualized IEP or had otherwise denied him a FAPE.

R.S. argues that the district court misunderstood the significance of Dr. van Dijk's testimony. Rather than demonstrating specifically that Highland Park's actions prevented R.S. from learning, R.S. argues that Dr. Van Dijk

testified that *any* educational environment in which a child with R.S.'s disabilities suffered repeated falls and injuries could not possibly be reasonably calculated to enable that child to receive educational benefits or to make appropriate progress.  This is not totally accurate; Dr. van Dijk specifically opined on Highland Park's IEP for R.S., and R.S.'s counsel in fact stipulated that Dr. van Dijk's conclusions would be different if the allegations in R.S.'s due process hearing complaint were false.

Moreover, R.S.'s contention calls for a retrospective rather than prospective evaluation of his IEP.  "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials.*" Endrew F.*, 137 S. Ct. at 999.  That R.S. suffered some minor injuries does not mean that R.S.'s IEP was not reasonably calculated to prevent injuries from occurring to the maximum extent feasible.  R.S. took issue with a statement by one of Highland Park's physical therapists that "the only way to prevent R.S. from falling and suffering injury was to restrain and immobilize him completely."  But this may well have been an accurate statement—the same therapist testified that, when [R.S.] was working on his mobility and postural control, he was "at risk just like any child" is when learning a new skill.  And each time R.S. fell, Highland Park implemented new measures that were intended to prevent the fall from reoccurring.  That these measures were not 100% successful does not establish that Highland Park's IEP was not reasonably calculated to allow him to learn.

R.S. argues that he did not experience injuries in Virginia, at home, or at Chase's Place.  But the record indicates R.S.'s lessons at Highland Park schools focused much more on developing his independence and functional skills and less on grade-level academics, and these types of lessons likely came with greater risk of mishap.  And R.S.'s independent mobility actually increased enough during this period that Highland Park specifically performed

No. 19-10458

an O&M Evaluation to account for the changes. There are thus explanations for the difference in injury rates other than the safety protocols in Highland Park's IEPs being unreasonable.[11]

In short, the district court did not clearly err in finding that "[a]ll children are at risk for suffering from minor falls, bumps, and bruises while at school, especially when exploring and interacting with the world around them," and that R.S.'s injuries did not go "beyond the scope of safety." The court was therefore correct to conclude that R.S. failed to establish his IEP was not individualized because it did not sufficiently ensure his safety.

**b.**

R.S. blends his arguments regarding Highland Park's alleged failure to account for the skill levels he previously displayed while attending school in Virginia and the school district's alleged failure to implement the recommendations of its evaluators and consultants, ultimately arguing that Highland Park failed to individualize R.S.'s IEP because it ignored relevant information from multiple sources.

With respect to R.S.'s prior performance, the district court found that "records from his school district in Virginia do not support the level of skill and progress [R.S.] alleges he had achieved before his enrollment in" Highland Park. Specifically, R.S.'s 2011 Virginia IEP noted that he had "difficulty showing mastery of learned skills over time," and that "it [was] difficult to accurately assess his academic skills due to inattention." The district court made detailed findings regarding the performance levels R.S. displayed with respect to communication, vision, mobility, and academic skills while he was in Virginia and concluded that the levels were not such that R.S. demonstrated

---

[11] As stated, R.S. has not raised a claim based on any failure by Highland Park to adhere to its IEP, including any safety protocols that it might have contained.

marked regression that Highland Park failed to notice. And, to the extent R.S. did experience some minor regression during his first year at Highland Park, the district court found that Highland Park properly offered compensatory services to correct the problem through the TSBVI consultations.

Each of these findings is supported by specific passages in R.S.'s Virginia IEP and other evidentiary evidence, and they are not clearly erroneous. Further, the record indicates that Highland Park specifically considered R.S.'s Virginia IEP and rejected some of the goals as ill-suited to his abilities. R.S. thus fails to establish that Highland Park disregarded his previous performance.

R.S. also contends that, from what his parents observed, the school district failed to put many of the TSBVI consultant Baltisberger's recommendations into practice. However, Baltisberger testified at the administrative hearing that the school district had already begun to implement many of his suggestions through R.S.'s TVI, that he witnessed the techniques being employed on each of his subsequent visits, and that he did not observe anything inappropriate on the part of the school district. And, during Blatisberger's final visit in March of 2015, Baltisberger specifically noted that the school district "really seemed to be hitting their stride more with the [A]ctive [L]earning activities" and observed that R.S. had made progress. The district court thus did not clearly err in finding that R.S.'s "argument that [Highland Park] failed to implement the recommendations provided by its evaluators and outside consultants is not supported by the evidence in the record." R.S. has accordingly failed to establish that his IEP was not individualized, and the district court was therefore correct that the first *Michael F.* factor weighs in favor of Highland Park.

No. 19-10458

**2.**

Under IDEA, school districts are required to provide special education in the "least restrictive environment" appropriate to the child's needs.  20 U.S.C. § 1412(a)(5)(A).  Also known as the "mainstreaming" requirement, the statute specifies that

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.*  This circuit applies the two-step test established in *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989), to determine whether a school district has satisfied the mainstreaming requirement.  "First, we ask whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily for a given child." *Id.* "If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate." *Id.*

R.S. does not explicitly employ the two-step *Daniel R.R.* framework, but he appears to concede that Highland Park did not run afoul of the first step of the inquiry—that is, that in his case, education in the regular classroom with the aid of supplementary services is not feasible.  He instead appears to argue that Highland Park failed to satisfy the second step requiring the school district to mainstream him to the maximum extent appropriate because, he alleges, he did not have meaningful contact with his peers.  *Daniel R.R.* itself offered little guidance as to the second step except to state that schools are required to offer a "continuum of services" that might, where appropriate,

19

include "placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess." 874 F.2d at 1050. The "appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops," we stated. *Id.*

R.S. points to testimony and other documents authored by his mother alleging that he was excluded from various events and to testimony from Dr. van Dijk criticizing Highland Park's alleged isolation of R.S. because children with R.S.'s condition learn through imitation. However, as discussed above, Dr. van Dijk's testimony was expressly predicated on the truth of the allegations in R.S.'s due process complaint, and he specifically relied on claims that R.S. was removed from a single event when he made enthusiastic sounds that officials misinterpreted as expressions of stress and agitation.

The district court did not make any findings as to whether and how this incident occurred, and even R.S.'s mother's own statements indicate Highland Park personnel disagreed that they had misinterpreted R.S.'s demeanor and vocalizations. Moreover, even if the incident occurred as alleged, the district court seems to have implicitly found that it was the exception rather than the rule. The court approvingly cited Hyer Elementary's policy of "reverse inclusion," under which R.S.'s general education peers would eat lunch with him in his special education classroom. The court found that R.S. also had interaction in the general education classroom, on school field trips, on the playground, and during school assemblies. It further found that R.S. interacted with his general education peers at McCulloch Middle School through a peer-tutor program, during PE, in the cafeteria during the lunch period, and during his job delivering items throughout the campus. Each of

these findings is supported by testimony from school officials, and they are not clearly erroneous.

Other than Dr. van Dijk's testimony, R.S. offers no evidence that greater integration appropriate to his needs was possible. He has therefore failed to establish that Highland Park failed to implement his IEP in the least restrictive environment appropriate to his needs.

**3.**

The district court found that "[t]he record is replete with examples of coordination and collaboration between HPISD, Plaintiff's parents, outside consultations, [sic] and Plaintiff's private specialists," and it concluded that the evidence supported the administrative hearing officer's finding that "[t]he District went to extraordinary lengths to include [R.S.'s] [p]arents in [R.S.'s] entire educational program." Specifically, it pointed to the numerous meetings in which the ARD Committee collaborated with staff, R.S.'s parents, and outside consultants and service providers to develop R.S.'s IEP. At least one of R.S.'s parents participated in every ARDC meeting, the court found.

R.S. does not challenge the district court's findings that his IEP was developed at ARDC meetings in which his parents participated. Rather, he appears to first imply that Highland Park did not sufficiently collaborate in other contexts, stating that "mere staff attendance at ARD meetings, however lengthy, does not satisfy the requirement" because "teachers and other staff members must work with the parents effectively outside of ARD meetings as well." But the district court found and the record supports that Highland Park also engaged with R.S.'s parents during monthly "collaboration meetings" and an extensive amount of phone calls, emails, and other remote communication.

R.S. then largely restates his contentions regarding the first *Michael F.* factor, which concerns whether his IEP was sufficiently individualized. He argues that Highland Park did not collaborate with his parents because it

failed to give appropriate consideration to his parents' urging that it ensure R.S.'s safety, pay greater attention to R.S.'s skill levels prior to attending school in Highland Park, and provide sufficient training to staff members.

As discussed above, R.S. has not established that Highland Park did not properly consider his safety or his skill levels in his prior school system in Virginia, and he has accordingly also not demonstrated that Highland Park failed to consider his parent's urging to do so. Similarly, the district court found and the record confirms that Highland Park provided frequent and extensive training to its staff on working with R.S.'s unique needs, safety issues, and equipment, and R.S. thus cannot demonstrate that the school district did not properly consider his parents urging that it provide proper training. *Cf. Juan P.*, 582 F.3d at 587 (affirming finding that school district did not provide services in a coordinated and collaborative way where it supplied only a one-page list of tips to its staff on how to work with children with the plaintiff's condition).

Indeed, the district court found and the record reflects that the input from R.S.'s parents was nearly always incorporated into R.S.'s IEP. And insofar as Highland Park declined to incorporate some of R.S.'s parent's suggestions, the refusal does not violated IDEA because "[t]he right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003). R.S. has not provided any evidence of a "bad faith exclusion of the parents or refusal to listen to or consider [their] input," *id.*, and the third *Michael F.* factor thus also weighs in favor of Highland Park.

**4.**

The last factor this court evaluates in considering whether an IEP was reasonably calculated to provide educational benefits is whether the plan did, in fact, result in the child achieving academic and non-academic benefits.

*Michael F.*, 118 F.3d at 254.  Notwithstanding this court's statements that there is no specific way in which the *Michael F.* factors should be weighed, "it has long held that the fourth factor is critical." *Renee J. as Next Friend of C.J. v. Houston Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019) (citing *R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813-14 (5th Cir. 2012)).

Here, the district court made detailed findings regarding whether R.S. advanced or retained his skills in communication, vision, mobility, fine motor skills, and academics while attending schools in the Highland Park district. With respect to communication, it found that, although R.S. had experienced some initial regression, he eventually learned to independently use his AAC device to answer yes or no questions; identify his name, school, and basic needs; and make choices—skills he did not consistently demonstrate prior to Highland Park's instruction.  Regarding vision, the court determined that there was insufficient evidence to support R.S.'s claim that he had previously been in "CVI Phase III" resolution, a subclassification based on how severely his CVI prevented him from processing visual information, and thus the 2015 evaluations classifying him as CVI Phase II were not evidence of regression. The court noted that, although R.S. did not display significant progress with moving forward in his gait trainer, he displayed other progress in his mobility skills, including being able to sit and stand upright for longer periods and requiring less assistance during transitions between equipment.  The court also found that R.S. advanced in his fine motor skills, showing improvement in both his ability to reach and maintain a grasp and in the range of items he would grasp, as well as his ability to feed himself.  Lastly, the court found that R.S. made academic progress and that by May 2015, he could answer "where" questions with sixty-three percent accuracy, "what" questions with sixty-nine percent accuracy, and "who" questions with sixty-one percent accuracy, as well as identify the numbers one through ten and the next number in a sequence

with seventy-five percent accuracy.   Each of these findings is supported by comparisons between provisions in R.S.'s 2011 FIE from Virginia and the May 2015 FIE that was administered after he had attended Highland Park schools for three years.

R.S. argues that these findings are in error.  He contends that he lost his ability to communicate because Highland Park elected to use an iPad AAC device rather than the Dynavox system he had previously used, and he dismisses the district court's finding that he had learned to activate his device independently as "a *de minimis* advance over a four year period."  R.S argues that the district court was wrong to focus on whether he had declined from CVI Phase III to Phase II because, regardless of the classification, the evidence demonstrated R.S. had decreased in his ability to see without color or pattern preferences, to display typical social responses to visual stimuli, and to view simple books or other two-dimensional material.  R.S. also points out that his 2015 FIE acknowledged that his ability to move forward in his gait trainer had "decreased some" and that the May 2012 FIE Highland Park performed soon after R.S.'s initial enrollment indicated he could stand and sit upright for similar lengths of time to those listed in the final 2015 FIE.  He additionally argues generally that he did not experience significant progress in other areas and that the goals set by Highland Park represented steps back from skills he had previously mastered in Virginia.  And even if the district court properly located a few skills that he had advanced in, R.S. contends, this was *de minimis* progress because "[v]ery few children, with or without disabilities, make no progress on any skill whatsoever over the course of a four year period."

R.S. primarily relies on the Supreme Court's decision in *Endrew F.,* in which the Court rejected a standard adopted by the Tenth Circuit under which an IEP was considered adequate if it was calculated to provide "'merely more than *de minimis*' progress from year to year."  137 S. Ct. at 1001.  The Court

concluded that "receiving instruction that aims so low would be tantamount to sitting idly awaiting the time when they were old enough to 'drop out.'" *Id.* (quoting *Rowley*, 458 U.S. at 179) (cleaned up).  R.S.'s reliance on *Endrew F.* is misplaced.

First, R.S. does not address all the district court's findings of progress, and his arguments with respect to several of the findings that he does challenge rely on evidence that is arguably contradicted by other evidence in the record.  For example, he cites the FIE that Highland Park performed shortly after R.S.'s enrollment in 2012 as evidence of his prior skill levels, but this FIE used different language than the IEP the Virginia school district employed shortly before his transfer and, to the extent the measurements are comparable, showed greatly different performance levels.[12]  It is the province of the district court to weigh conflicting evidence, and R.S. thus does not establish that the district court clearly erred in finding that R.S. had made substantial rather than slight progress.

Moreover, *Endrew F.*'s rejection of the "merely more than *de minimis*" standard must be viewed in conjunction with its primary holding—that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id.* at 999.  Whether advancement is so trivial or minor as to qualify as *de minimis* must be evaluated in light of the child's circumstances, and a court may determine that aiming for small amounts of progress is appropriately ambitious given a child's unique needs.  Based on Dr. van Dijk's testimony, the district court found that R.S.'s "accomplishments happen more slowly and incrementally, with the 'big gains' occurring over a number of years or long periods of time."  Therefore, the

---

[12] Additionally, R.S.'s parents expressed concerns numerous times regarding the accuracy of Highland Park's data collection.

district court did not clearly err in determining that the progress R.S. dismisses as *de minimis* was significant in light of his circumstances.

In sum, the IEPs that Highland Park developed for R.S. cannot remotely be characterized as "sitting idly awaiting the time when [he was] old enough to 'drop out.'" *Id.* (quoting *Rowley*, 458 U.S. at 179) (cleaned up). Highland Park expended a great amount of time and resources developing and implementing an IEP that was based on multiple in-depth evaluations of R.S.'s unique needs and abilities with significant input from R.S.'s parents and expert consultants, and R.S. achieved at least some academic and non-academic benefits as a result of his plan. The district court accordingly did not err in finding that Highland Park provided R.S. with a FAPE as IDEA requires.[13]

**\* \* \***

Based on the foregoing, we AFFIRM the district court's grant of summary judgment against R.S. on his IDEA claim and its dismissal of R.S.'s remaining claims.

---

[13] With respect to the district court's dismissal of his § 1983 and Rehabilitation Act claims as foreclosed by the disposition of his IDEA claim, R.S. argues only that the dismissal was necessarily erroneous because the court's ruling on his IDEA claim was in error. Because we affirm the district court's IDEA ruling, we reject these separate challenges.